IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SAM LEE BATES, | ) | Case No. 3:21-cv-01055 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Sam Lee Bates, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Bates challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ misevaluated the opinion evidence of Dr. Arun Patel. Because the ALJ failed to apply proper legal standards in how she expressed her evaluation of Dr. Patel's opinion, I recommend that the Commissioner's final decision denying Bates's applications for DIB and SSI be vacated and that Bate's case be remanded for further consideration.

I.  **Procedural History**

On June 22, 2019, Bates applied for SSI. (Tr. 224-233).[2] On July 17, 2019, Bates applied for DIB and amended his application on August 23, 2019. (Tr. 235-238). He alleged

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).
[2] The administrative transcript appears at ECF Doc. 8.

that he became disabled on May 26, 2019, due to a knee problem. (Tr. 254, 257). The SSA denied Bates's applications initially and upon reconsideration. (Tr. 69-80, 97-108).

ALJ Mary Morrow heard Bates's case on August 18, 2020 and denied the claim in an August 26, 2020 decision. (Tr. 21-29, 35-67). In doing so, the ALJ determined at Step Four of the sequential evaluation process that Bates had the residual functional capacity ("RFC") to perform light work, except that:

> [Bates can] stand/walk up to 4 hours a day; sit up to 6 hours a day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and occasionally push/pull or operate foot controls with the right lower extremity. He requires the use of a cane to ambulate; and can never be exposed to hazards such as moving machinery and unprotected heights.

(Tr. 25). Based on vocational expert testimony that a hypothetical individual with Bates's age, experience, and RFC could work in such available positions as an inspector, document preparer, or sorter, the ALJ determined Bates wasn't disabled. (Tr. 28-29). On March 18, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). And, on May 2, 2021, Bates filed a complaint to obtain judicial review. ECF Doc. 1.

**II.     Evidence**

    **A.     Personal, Educational, and Vocational Evidence**

Bates was born on May 13, 2018 and was 37 years old on the alleged onset date. (Tr. 254). He graduated from high school and had previously worked as a cook and a line worker for a metal finishing company. (Tr. 258).

    **B.     Relevant Medical Evidence**

On October 23, 2018, Bates was seen at Mercy Hospital's emergency department complaining of right knee pain following a "twisting injury." (Tr. 436-437). He reported that

2

his knee bent inward about 10 days prior but still was painful and swollen. (Tr. 437). On examination, it was noted that his knee exhibited bony tenderness but no effusion or ecchymosis. *Id*. The hospital found that he had internal derangement in his knee, which was wrapped, and it discharged him. (Tr. 438).

On October 25, 2018, Bates saw Arun Patel, MD. (Tr. 435-436). He reported having previously had arthroscopic surgery on his right knee and experiencing progressively worse intermittent pain in it since. (Tr. 436). He described the pain as radiating anteriorly over the shin, with occasional numbness around the lateral side, and the sensation of water running down his leg. *Id*. He had previously been told he had knee effusion and reported difficulty going up or down the stairs. *Id*. On examination, Dr. Patel observed that Bates had effusion at the joint, valgus deformity on his right knee, an antalgic gait, marked tenderness over the lateral joint line, and that the valgus deformity appeared fixed. *Id*. Reviewing Bates's prior x-rays, Dr. Patel observed that he had a marked degenerative change in the lateral compartment. *Id*. Dr. Patel diagnosed Bates with valgus osteoarthritis in his right knee and, because of his age, counseled him against knee replacement and gave him a lidocaine injection. *Id*.

On November 13, 2018, Bates returned to Dr. Patel for a follow-up after his injection. (Tr. 435). Bates reported reduced pain, feeling it only at the end of a work shift, but noted he also took about 1600 milligrams of ibuprofen and occasionally supplemented with other pain medication. *Id*. He also reported pain in his calf muscle following the injection, but on examination there was no tenderness, and his knee showed some effusion. *Id*. Dr. Patel continued Bates's treatment as his symptoms were tolerable. *Id*.

On January 5, 2019, Bates was seen at ProMedica Flower Hospital, complaining of knee pain. (Tr. 591). He reported that he needed surgery on his knee and had received a cortisone

3

shot, but it had worn off and his pain had worsened. *Id*. Ibuprofen offered no relief. *Id*. On examination, he was noted to have tenderness, a decreased range of motion, and pain with that motion. (Tr. 593). Bates had an x-ray taken of his knee that indicated he had osteoarthritis. (Tr. 594). He was given a Toradol shot, his knee was wrapped, and he was discharged. *Id.*

On January 8, 2018, Bates returned to Dr. Patel, reporting continued pain. (Tr. 434). Dr. Patel observed that Bates could stand with a valgus deformity and showed significant synovitis without much effusion. *Id.* Dr. Patel maintained his osteoarthritis diagnosis but noted Bates may also have rheumatoid arthritis. (Tr. 435). He indicated that he reviewed x-rays that showed significant degenerative arthritis in the lateral compartment of his knee. *Id.*

On January 15, 2019, Bates saw Dr. Patel for pain. (Tr. 433-434). It was noted that he had a cane at home but came without one. (Tr. 434). Dr. Patel observed that Bates stood with a valgus deformity, was unable to show significant correction of the deformity, walked with a marked antalgic gait, had a valgus knee, and had mild effusion of his knee joint, marked tenderness over the lateral joint line, and no anteroposterior instability. *Id.* Dr. Patel reviewed additional x-rays with Bates that indicated that there was about 15 degrees of valgus deformity with marked narrowing of the lateral joint space, but Bates's patellofemoral compartment appeared satisfactory. *Id.* He specified his diagnosis to valgus osteoarthritis in Bates's right knee with 15 degrees of flexion contracture and 15 degrees of valgus deformity. *Id.* He discussed possible treatments with Bates and told him he would get back to him after consulting his colleagues. *Id.*

On February 11, 2019, Bates underwent surgery for his valgus deformity. (Tr. 401). He was kept in the hospital until February 14, at which time he was given good prognosis and discharged with a rolling walker to in-patient rehabilitation. (Tr. 404-433).

4

From February 14 to February 21, 2019, Bates received in-patient therapy. (Tr. 502, 506, 589-591). During his first session, on physical examination, his extremities were noted to be normal. (Tr. 508). In his therapy, he was assessed with decreased balance, endurance, gross motor skills, mobility, range of motion in his lower extremities, and strength in his extremities. (Tr. 509). He reported that his pain was a 6 out of 10 and that he lacked reliable family support, did not have mobility equipment at home, and frequently fell. (Tr. 510).

As part of this initial therapy session, Bates's right lower extremity was assessed, and he had movement that was generally 2 out of 5 (with 5 being normal). (Tr. 511). He continued with therapy, working on goals specific to being able to be discharged safely to his home. (Tr. 512-524, 529). Initially, he was assessed with pain that was a 6 out of 10, and he could move from his bed with stand-by assistance, transfer to a chair with contact-guard assistance, and had good to fair balance. (Tr. 516). Following his exercises, his movement improved from between a 3 to 4 out of 5. (Tr. 517). Later, his pain remained the same or increased, but he was able to move from his bed and transfer to chairs "modified independent[ly];" his movement, when noted, was 3 to 4 out of 5; and his balance was good to fair. (Tr. 530-531, 536, 548, 553-554, 563-564, 567-568, 572-577, 581-582).

On February 21, 2019, Bates also had a follow-up appointment with Dr. Patel about his knee. (Tr. 394). He reported that he was still not putting weight on it, but it was feeling better. *Id.* On examination, Dr. Patel noted that his incisions were well-healed. *Id.*

On February 28, 2019, Bates met with Joshua Whitmer, APRN, to establish care with ProMedica Wellness Center. (Tr. 499). Bates reported knee pain that was a 6 out of 10, mild, and constant. *Id.* He described the symptoms as including an inability to put weight on his ankle and a loss of motion; he did not have a loss of sensation, muscle weakness, numbness, or

5

tingling. *Id.* On examination, it was noted that he was neurologically coordinated, and his gait was normal. (Tr. 501). He was assessed with arthritis. *Id.*

On March 19, 2019, Bates had knee x-rays taken, and Dr. Patel noted that his osteotomy appeared to be healing and the correction appeared satisfactory. (Tr. 392).

On March 20, 2019, Bates started outpatient physical therapy. (Tr. 388). Bates reported that he had not been putting too much weight on his knee yet, he had increased difficulty with bending and straightening, and his pain increased along the medial joint line with cold temperature or prolonged positioning, walking, or going up and down stairs. *Id.* During the session, the therapist noted that he had a difficult gait because of his use of his left leg and his decreased strength and cadence. (Tr. 390). Additionally, it was noted that he had difficulty sitting, standing, ambulating, grooming/dressing, climbing stairs, bending, squatting, and kneeling, and was unable to lift or carry. *Id.* The therapist assessed that he had about a 75 percent impairment in functionality. *Id.* The therapist noted that, following the exercises, Bates's motion increased, but he had problems related to his right knee pain, which was a 7 out of 10; specifically, he had issued with his range of motion, strength, functioning, edema, and gait. (Tr. 389-390).

From March 22 to April 8, 2019, Bates continued his therapy sessions twice a week. (Tr. 369-387). Initially, Bates did not report any increased pain but in later sessions he indicated either increased pain or soreness after the prior session. *Id.* He generally rated his pain as a 6 out of 10. *Id.* The therapist consistently noted he was progressing towards his goals, worked on correcting his deficits in his knee's range of motion, and generally tolerated the exercises well. *Id.* During his last session, the therapist noted he had increased weight bearing symmetry during ambulation with crutches and concentrated on heel-toe gait pattern. (Tr. 369-370).

On April 9, 2019, Bates had a post-operation follow-up with Dr. Patel, who indicated he was doing well and had a good range of motion. (Tr. 368). Further x-rays indicated his osteotomy appeared to have healed particularly in the midline, there was joint space on the lateral side, and the alignment was only minimally valgus. *Id.*

From April 10 to May 2, 2019, Bates continued with his therapy. (Tr. 340-367). He generally reported a consistent level of pain or soreness and noted trying to do the exercises at home. *Id.* Initially, his therapy focused on phasing out the use of his knee brace and transitioning to only one crutch. (Tr. 364-367). Later sessions focused on increasing the weight he placed on the leg and walking with a cane. (Tr. 340-362). The therapist noted he was progressing in his goals and, generally, tolerated the exercises. *Id.*

On May 6, 2019, Bates saw Dr. Patel. (Tr. 340). Dr. Patel observed that Bates was doing better but still used a cane so that his gait was not antalgic. *Id.* Bates took 400 milligrams of ibuprofen twice a day but attributed his pain to the weather getting colder. *Id.* On examination, Dr. Patel noted that he maintained excellent range of motion but had some mild flexion contracture. *Id.* Bates did not have any instability. *Id.* Bates had three x-rays taken of his knee, which showed continued healing and some osteotomy on one plane. *Id.* Dr. Patel assessed that Bates could return to work on May 8, but if he had pain he should stop. *Id.*

From May 7 to May 16, 2019, Bates had four therapy sessions. (Tr. 327-339). During his first session, Bates reported knee pain of 7 out of 10 and was encouraged to walk without any assistive devices at home and use a cane in public. (Tr. 338). The therapist noted that he had a fair tolerance of the treatment but, when instructed to alternate standing marches, he stated he did not feel he was ready to put all of his weight on the right leg. (Tr. 339). During his subsequent sessions, Bates generally reported efforts to put more weight on his right leg, that he was

7

working again, and that his leg still felt good. (Tr. 328-336). The therapist noted that he was progressing towards his goals and had a fair tolerance of the exercises completed. *Id.*

On May 28, 2019, Bates saw Dr. Patel, with new complaints about his knee. (Tr. 326-327). Bates reported that he had intense pain over the medial and lateral side of the joint; he reported that he had been back to work but could only work two days, and he still used a cane when walking. (Tr. 327). On examination, Dr. Patel noted that his knee alignment appeared satisfactory and diagnosed him with continued primary osteoarthritis. *Id.* Dr. Patel offered to do an injection or to send him to more physical therapy, but Bates declined both, stating that he felt he should go on disability. *Id.*

On June 25, 2019, Bates was seen at Mercy Hospital's emergency department, complaining of left foot pain and right knee pain. (Tr. 322). On examination, it was noted that he had a moderate to large amount of swelling on two aspects of his right knee and he was able to flex and extend the right hip and had full range of motion in the right ankle. (Tr. 324). He also had mild tenderness on the left midfoot that did not extend to the toes or ankle and a full range of motion in the left toes, ankle, and knee. *Id.* Bates had x-rays taken of his left foot, which was normal, and of his right knee, which showed stable post-operative changes in his right femur, degenerative changes in the right knee, and questionable soft tissue swelling over the medial knee. (Tr. 324, 814-815) His foot was wrapped, he was given a prescription for Percocet, and he was discharged. (Tr. 325).

On June 27, 2019, Bates had a follow-up appointment with Dr. Patel. (Tr. 321). Bates reported that he tried to return to work for two days a week, but was still experiencing pain and he had developed pain and numbness in his left foot. (Tr. 321-322). On examination, Dr. Patel observed that Bates's left leg alignment appeared normal, his right knee appeared neutral but had

8

swelling and crepitation in the joint. (Tr. 322) He reviewed the x-rays taken by the emergency room and noted that there was prominent navicular bone on the left side. *Id.* He instructed Bates to wear his work shoes with orthotics, which would help with his left foot pain, and that Bates could apply for disability because of his right knee. *Id.*

On November 12, 2019, Bates saw Dr. Patel, complaining of numbness on the lateral side and bottom of his left foot. (Tr. 710). On examination, Dr. Patel found that Bates had normal sensation on his left foot, and he had excellent strength in the muscle groups tested. *Id.* Bates stood with minimal valgus posture and no swelling or tender spots. *Id.* Bates had additional x-rays, which showed the osteotomy was continuing to consolidate. *Id.* Dr. Patel gave him a wedge to help relieve some of the symptoms. *Id.*

On December 17, 2019, Bates returned to see Dr. Patel. (Tr. 725). Bates reported that the wedge worsened his pain and rejected Dr. Patel's offer of an injection. (Tr. 729).

On January 2, 2020, Bates went to an emergency room, complaining of a cough and aching back pain that had persisted for two weeks. (Tr. 824-825). Bates underwent an x-ray of his back that indicated he had degenerative disc disease. (Tr. 828). He was assessed with thoracic degenerative disc disease and an acute upper respiratory infection. (Tr. 829).

On March 2, 2020, Bates saw Nurse Whitmer again. (Tr. 739). Bates reported having palpitations and passing out, with his heart pounding in his chest. *Id.* On physical examination, it was noted that his gait was antalgic, and he walked with a cane, but his cardiovascular system was normal. (Tr. 740-741). His physical examination was unremarkable, and testing and a consultation were ordered based on his neurological and cardiac issues. (Tr. 742).

On March 20, 2020, Bates had a consultation with a cardiologist. (Tr. 773). Bates reported that he would be standing up urinating when he would suddenly feel his heart beating

9

fast and he would collapse; other times, he would have a different type of spell where he started drooling. (Tr. 774). The cardiologist reviewed his electroencephalogram ("EEG") results, which he believed showed normal functioning. *Id.* His physical examination results were normal. (Tr. 777). The cardiologist recommended having a monitor implanted for his syncope. (Tr. 777, 883). Bates agreed and underwent the procedure. *Id.*

        **C.**      **Relevant Opinion Evidence**

              **1.**      **Physical Assessment – Arun Patel, M.D.**

On July 16, 2019, Dr. Patel completed a physical assessment form. (Tr. 316-317). He diagnosed Bates with osteoarthritis in his right knee and left foot pain. (Tr. 316). Dr. Patel indicated Bates's symptoms would frequently interfere with his attention and concentration in performing simple work-related tasks; he would need to recline or lie down during a workday in excess of the allotted break times, and he could: walk for 1 hour before needing to rest, sit for 4 hours in an 8-hour workday, and stand or walk for 1 hour in an 8-hour workday. *Id.* Dr. Patel noted that Bates would need to take unscheduled breaks during the day, which would occur at least every hour for 15 to 30 minutes, and he would be absent from work more than 4 times a month. (Tr. 316-317). He could occasionally lift less than 10 pounds but never more. (Tr. 316).

              **2.**      **State Agency Consultants**

On August 21, 2019, Diane Manos, M.D., reviewed Bates's medical records to determine his physical limitations. (Tr. 76-78). Dr. Manos found that Bates could occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, stand or walk for 4 hours, sit for 6 hours in an 8-hour workday, and had limited pushing or pulling in his right lower extremity. (Tr. 76-77). Also, she found that Bates could occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; and occasionally kneel, crouch, or

crawl. (Tr. 77). She also found that Bates should avoid exposure to all hazards. (Tr. 78). On January 4, 2020, Maria Congbalay, M.D., reconsidered the medical evidence of Bates's physical limitations and affirmed Dr. Manos's findings. (Tr. 103-106).

### D. Relevant Testimonial Evidence

#### 1. Sam Bates

Bates testified at the hearing. (Tr. 41-60). He lived with his wife, who was the main source of their income, and he worked part-time. (Tr. 42). He had not had a drivers' license since 2003 because it was initially taken away and his neurologist had since told him not to drive. (Tr. 42-43). He worked about 10 to 12 hours a week as a cook where his shifts were about 5 hours long. (Tr. 44-45). During his shifts, he would often change between sitting and standing. (Tr. 45). He reviewed his prior employment, which all entailed standing. (Tr. 46-48).

Bates believed the biggest problem preventing him from working was that he still needed his knee to be replaced. (Tr. 48). He said that his knee would unexpectedly give out, causing him to fall. (Tr. 48-49). He had gone to the hospital due to injuries from falling, but he had not been hospitalized. (Tr. 49). He used a cane to walk. *Id*. He experienced a sharp, shooting, burning pain through the center of his knee. (Tr. 50). He took ibuprofen but surgery was his only other option, and he cannot schedule that until after he hears from his cardiologist and neurologist. *Id.* Bates explained that he had had pain in his knee since he was in high school. (Tr. 51). He could walk about 10 feet without a cane and about a block with a cane; he could sit for about 5 to 7 minutes, and he could stand for about 5 to 10 minutes. *Id.* He could also pick up about 10 pounds. *Id.* He constantly used his cane and did not feel safe walking without it. *Id.*

Bates explained that he also had seizures, which he could occasionally feel coming on when he began to feel warm and nauseous. (Tr. 52). When seizures came on, they lasted for two

11

to three minutes, his arms and hands would shake, his eyes would shut, he coughed and drooled, and he lost his sight and ability to speak. *Id.* If he couldn't grab onto something, he would also fall down. (Tr. 52-53). He had been having the seizures for about eight years, but he never lost a job from them. (Tr. 53). He was previously having the seizures about two or three times a day, but he had started to have them every other day or every three days. (Tr. 53-54). He had undergone an EEG, but the doctors told him that they could not figure out their cause. (Tr. 54). He slept between 6 to 8 hours a night. *Id.* He could take care of his personal hygiene, dress himself, prepare simple means, and do small amounts of dishes. (Tr. 54-55). He could not do household chores because of his knees and did not do grocery stopping. (Tr. 55). He elevated his legs about 10 times a day for 10 to 20 minutes. (Tr. 58).

### 2. Vocational Expert

Mark Pinti testified as a vocational expert at the hearing. (Tr. 60-66). He opined that a hypothetical person with Bates's age, experience, education, and the ALJ's proposed limitations would be able to work as an inspector, document preparer, or sorter. (Tr. 63-64). He noted that a worker who would be off task more than ten percent of the time may not be competitive and that employers only tolerate about one day a month absenteeism. (Tr. 64-65).

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Id.* (quotation marks omitted). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

13

B.     **Step Four: Medical Opinion Evaluation**

Bates contends that the ALJ misevaluated the medical source opinion of Dr. Patel by failing to provide an adequate explanation for her rejection of his limitations. ECF Doc. 11 at 9-10. Specifically, Bates cites Dr. Patel's findings that he should avoid lifting 10 or more pounds, was limited to sitting for four hours and standing/walking for one hour in an eight-hour workday, and would need to recline or lay down during a workday in excess of normal breaks. ECF Doc. 11 at 10. He argues that Dr. Patel's findings were both supported and consistent, but the ALJ's two-sentence boilerplate analysis failed to provide her rational for rejecting the limitations. ECF Doc. 11 at 11-14. The Commissioner disagrees, asserting the ALJ's summary of the evidence provided substantial evidence in support of the ALJ's finding. *See* ECF Doc. 13 at 6-9. In his reply brief, Bates contends the Commissioner's argument is a post hoc justification for the ALJ's determination and should be rejected. *See* ECF Doc. 15 at 1-3.

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[3]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

14

relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  See 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ failed to apply the proper standards in evaluating Dr. Patel's opinion because she did not provide an adequate explanation for finding the opinion "unpersuasive."  Although the ALJ referenced both the supportability and inconsistency of Dr. Patel's opinion, the mere recitation of the regulatory words is not sufficient to satisfy the regulations.  Here, ALJ failed to explicitly explain why she found Dr. Patel's opinion unsupported and inconsistent with the record and such reasons cannot be reasonably inferred from reading the decision as a whole.  Regarding Dr. Patel's opinion, the ALJ merely stated:

> The undersigned does not find Dr. Patel's opinion persuasive, as it is inconsistent with the medical record as a whole.  The severity of limitations opined by Dr. Patel is not supported by his own or any other medical records.

(Tr. 27).  The sentence immediately preceding this did identify some of Dr. Patel's findings.  *Id.* However, the ALJ never explained what about those findings she found to be inconsistent or unsupported nor, as Bates appropriately contends, did the ALJ provide any further explanation (as opposed to a mere summary of the evidence) elsewhere in the decision.  See ECF Doc. 11 at 13-14; (*see generally* Tr. 21-29).  And in the paragraph immediately following, the ALJ forges ahead to discuss the state agency physicians' opinions.  (Tr. 27).  The ALJ acknowledged her obligations under 20 C.F.R. §§ 404.1520c and 416.920c, but short of the above-quoted language, the ALJ provided no other analysis of the other factors.  (Tr. 25).

The Commissioner contends that the ALJ's summary of the evidence provide sufficient means for the court to determine that substantial evidence supports the finding that Dr. Patel's opinion was inconsistent and unsupported.  See ECF Doc. 13 at 7-9.  However, this misses the

15

point. Bates contends that the ALJ failed to provide any explanation. And she didn't. The court cannot divine the ALJ's reasoning from her summary of the evidence without having some way of grounding that analysis in what the ALJ said. See Berryhill v. Shalala, 4 F.3d 993, at *6 (6th Cir. Sept. 16, 1993) [published in full-text format at 1993 WL 361792] (unpublished opinion) ("[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that the agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) (citation omitted)). Although it may be possible to find inconsistent evidence within the ALJ's summary, this does not inform the reader about whether that the contradiction formed the basis for the ALJ's rejection of Dr. Patel's opinion or why she found the opinion unsupported. See 20 C.F.R. § 404.1520c(c)(1)-(2). And as a result, the ALJ failed to build a logical bridge between the evidence and her determination. See Fleischer, 774 F. Supp. 2d at 877.

There is a basis for finding check box forms, such as Dr. Patel's, patently deficient. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 474-75 (6th Cir. 2016) (holding that a check box form was patently deficient due to the lack of explanation provided with it). And under some circumstances, an ALJ error in failing to explain the rejection of such a form, as done here, can be overlooked as harmless. Rabbers v. Comm'r of Soc. Sec., 582 F.3d 647, 654 (6th Cir. 2009). An error in an ALJ's evaluation of the opinion evidence may be harmless in one of three circumstances: (i) when the opinion was "so patently deficient that the Commissioner could not possibly credit it"; (ii) when the Commissioner made findings consistent with the opinion; or (iii) the Commissioner otherwise met the goals of the regulations by indirectly attacking the supportability or consistency of the opinion. Wilson v. Comm'r of Soc. Sec., 378

16

F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[4] I have reached just such a conclusion when the ALJ decision contains a detailed explanation of the medical record sufficient to permit the court to see why the ALJ discounted an opinion expressed on a check box form. *See Ballard v. Comm'r*, No. 5:21-cv-539, (N.D. Ohio, May 24, 2022).

Here, however, the ALJ's decision disposed of Bates's claim in a skimpy, nine-page decision. Of that, only four paragraphs – a scant page – were devoted to a description of the medical record. And the medical records summary never mentioned some of the functional issues addressed in Dr. Patel's opinion (such as his standing and sitting limitations). To be sure, Dr. Patel's opinion could have been more expansive, but it did articulate several discrete functional limitations that were consistent with his clinical observations. By sweeping that opinion aside with two boilerplate sentences that contained zero cross references to the medical record, the ALJ failed to meet either the letter or the spirit of the regulations. The ALJ did not meet the goals of the regulations by indirectly attacking the supportability or consistency of the opinion, and the ALJ did not make findings consistent with the opinion. Here, Dr. Patel's opinion offered more restrictive limitations than those adopted by the ALJ in her RFC. (*Compare* Tr. 25 *with* Tr. 316-317). And the vocational expert testified that absenteeism of the nature opined by Dr. Patel, would be work preclusive. (*See* Tr. 64-65, 316-317). To top it all off, the Commissioner has not even argue that Dr. Patel's decision was patently deficient because it was a check box form, making only one passing reference to the opinion being a check box form in

---

[4] While the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations. *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 WL 5176523, at *5 n.4 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 WL 3056108, at *11 n.8 (W.D. Tenn. July 20, 2021); *Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 WL 5792621, at *4 (N.D. Ohio Sept. 29, 2020).

17

its introduction. *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developing argumentation are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); ECF Doc. 13 at 1.

The ALJ may have had a good basis for finding Dr. Patel's decision unpersuasive but that cannot be known from reading the decision because such as basis is unarticulated. At a minimum, the ALJ failed to build a logical bridge between the evidence and her findings sufficient to permit Bates to understand why his claim had been rejected. Accordingly, I recommend that the ALJ's decision be vacated and remanded.

## IV. Recommendation

Because the ALJ failed to apply proper legal standards in articulating why she found Dr. Patel's opinion unpersuasive, I recommend that the Commissioner's final decision denying Bates's applications for DIB and SSI be vacated and that Bates's case be remanded for further consideration.

Dated: May 27, 2022

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  See *United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).